Matthew B. Lowy, Child Welfare Law Specialist (NACC)
Kai N. Puhrmann
Lowy Law, P.L.L.C.
2419 Mullan Rd, Suite B
Missoula, Montana 59808
(406) 926-6500
documents@LowyLawFirm.com

*Attorney for Plaintiff, Lawrence Weinberger*

FILED MAY 24 2018

SHIRLEY E. FAUST, CLERK

By _____ Deputy

# MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

LAWRENCE WEINBERGER,

    Plaintiff,

    v.

911 DATAMASTER, a Foreign Limited Liability Company, SCOTT KREHBEIL individually, ERIC REGNIER individually, JOHN DOES I-XX, and ABC CORPORATIONS I-XX,

Cause No. DV-18-744

Department No. 3

Judge John W Larson

**COMPLAINT AND DEMAND FOR JURY TRIAL**

    COMES NOW Plaintiff Lawrence Weinberger, by and though his counsel of record, Matthew B. Lowy of Lowy Law, P.L.L.C., for his claim for relief against the above-named defendants states and alleges upon his information and belief as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is Lawrence Weinberger, and is represented by Lowy Law, PLLC. Mr. Weinberger is, and at all times relevant hereto was, a resident of Missoula County, Montana.

2. Defendant 911 Datamaster, Inc., is a foreign Corporation in good standing, having employees and doing business in Missoula County, Montana at the times in question.

3. Defendant Scott Krehbeil is an owner and senior partner of 911 Datamaster, Inc.

4. Defendant Eric Regnier is an owner and partner of 911 Datamaster, Inc.

5. The events that form the basis of this complaint occurred in Missoula County, Montana at the times in question.

6. This Court has jurisdiction over the parties, and the matters alleged herein, and the Fourth Judicial District Court in Missoula County is the proper place of venue for this case to proceed.

## GENERAL ALLEGATIONS

7. Mr. Weinberger was a professional software developer for over 20 years.

8. Mr. Weinberger worked specifically in the 911 emergency services computer coding and software creation field for over 14 years, from 2003 to 2017.

9. In 2003 Mr. Weinberger went to work for Contact One, a software developer who sold their product exclusively to municipalities for their 911 emergency services phone dispatch system. At Contact One Mr. Weinberger personally developed the computer software later named "MapSAG" that revolutionized the 911 systems nationwide. This software was used by municipalities large and small for their emergency services dispatch systems. Mr. Weinberger single-handedly created an entirely new 911 system which married traditional 911 software with geo-spacial mapping. A new name had to actually be coined to describe this system to differentiate it from previous systems; it is now called "Next Generation 911, or Next Gen 911" and the old system is called "Traditional 911." This Next Gen 911 that Mr. Weinberger invented proved to be so successful, revolutionary, and lucrative that in 2011 Contact One sold for $7.5 million dollars to the company Intrado on the basis of this software product Mr. Weinberger developed.

10. Datamaster 911 (hereinafter Datamaster or Defendant Company) was intimately aware of Mr. Weinberger's capabilities, his invention, and its value.

11. Defendants had previously worked cooperatively with Contact One, offering complimentary products and services. Defendants offered Traditional 911 and Contact One offered Next Gen 911 which are almost always merged.

12. The sale of Contact One to Intrado (Defendant's largest competitor), left Defendants in a position of competing against the company that now owned MapSAG, and more importantly, it left Defendants without a partner in the Next Gen 911 arena.

13. Since most of the projects going out to bid require both Traditional 911 and Next Gen 911 products and services, Defendants weren't even able to participate in the bidding process. The sale of Contact One essentially eliminated Defendants' market share and income stream.

14. Early January 2012 Defendant Scott Krehbeil (hereinafter Defendant Krehbeil), President, CEO, co-owner, and general manager of Defendant Company contacted Mr. Weinberger about the possibility of employing him.

15. Having personally worked with Mr. Weinberger previously on projects, Defendant Krehbeil was intimately aware of Mr. Weinberger's capabilities. Defendant Krehbeil knew that Mr. Weinberger had created the MapSAG algorithm and knew what Mr. Weinberger's intellectual property meant to Defendants in terms of market share and future success for his company.

16. Defendant Krehbeil told Mr. Weinberger that Datamaster was interested in designing and developing a new product to compete with MapSAG — the product that Mr. Weinberger had created for Contact One — now owned by Defendant's biggest competitor. Defendant Krehbeil knew Mr. Weinberger from his days at Contact One because they had worked directly with one another on several occasions.

17. Defendant Krehbeil initially wanted Mr. Weinberger to teach Datamaster's software developers about Next Gen 911 so they could compete against Intrado and remain relevant and competitive in the 911 software field.

18. Defendant Krehbeil told Mr. Weinberger that they had dedicated two of their most talented engineers to work full time on trying to develop a system like Mr. Weinberger had created. Defendant Krehbeil further stated that in six months, the engineers had gotten nowhere

19. Mr. Weinberger declined the initial offer, as he had hoped to further develop his algorithm personally for his own business venture, with an eye toward early retirement.

20. Mr. Weinberger is physically disabled and limited in what he can do in terms of physical work.  He suffers from Degenerative Disk Disease, and has a double-crush injury that has required several major surgeries over the years, including the fusing of three vertebrae in his neck.  These surgeries have only been mildly successful in terms of alleviating Mr. Weinberger's ongoing symptoms and pain.

21. Mr. Weinberger's medical conditions and physical disabilities makes the long hours and days and weeks of sitting at a desk and typing a grueling and pain-filled task.

22. These long hours of physical discomfort are required in order to learn new computer languages, implement them into a working computer program, and create new computer algorithms and software programs.

23. Mr. Weinberger informed Defendants of his disabilities at the time of Defendant's initial employment offer.

24.  Mid-January 2012 Defendant again contacted Mr. Weinberger.  Defendant promised Mr. Weinberger that his disability and reasonable accommodation requests were of no consequence and would be met immediately if he would

agree to work for them as a regular employee.  Mr. Weinberger's worsening health was such an important issue to him them that he told Defendant's that he would require reduced hours as needed and that he needed to be able to retire soon.  Defendant's assured Mr. Weinberger that this would be the last job he would ever need to have, which, based on their negotiations, Mr. Weinberger understood to mean that he would be fairly compensated and would have a job there until retirement.

25. Mr. Weinberger agreed to work for Defendant as a consultant after:

    1)  Again informing Defendant of his disabilities and medical conditions that would require accommodations including reduced hours, and,

    2)  After assurances from Defendant Krehbeil that Defendant Company would put in place a disability policy for him.

26. February 2012, after much urging from Defendants, Mr. Weinberger was made a regular employee of Defendant Company, after salary and compensation item negotiations.

27. During these negotiations, Mr. Weinberger offered Defendants the rights to his design in return for an ownership share in the company; however, Defendants declined this offer.  Accordingly, when the offer of employment was made and accepted, Mr. Weinberger and Defendants agreed that Mr. Weinberger was to retain ownership of his own design despite his status as Defendant Company's employee.

28. Mr. Weinberger continued working for Defendants until his untimely and unlawful discharge.

29. June 2017 Mr. Weinberger was unexpectedly fired from Defendant Company.

30. In the five plus years that Mr. Weinberger worked for Defendants, he was an exemplary employee, and expanded upon his own intellectual property that

he brought to Defendants to create the new and even further revolutionary 911 data system software "SpacialStation"  now misappropriated by Defendants and sold by Defendants for their exclusive benefit.

31. In 2012, unbeknownst to Mr. Weinberger, Defendant Krehbiel had a conversation with the main software engineer of Defendant Company at the time, Mohammed Habib.  Defendant Krehbeil told Mr. Habib that it was Defendant's goal to hire Mr. Weinberger, steal his intellectual property from him, and then fire Mr. Weinberger so that he could not gain any benefit from his own intellectual property, and then utilize Mr. Weinberger's intellectual property for his own exclusive benefit and gain.

32. Mr. Habib did not pass this information along to Mr. Weinberger until 2017.

33. Defendants did the exact same thing to Mr. Habib that they did to Mr. Weinberger: Defendants had Mr. Habib use his own intellectual property to create software systems of great value to Defendant Company, and then fired Mr. Habib and retained his intellectual property and used it for their own benefit.

34. This tends to show a continuing course of conduct undertaken by Defendants to employ fraud to take individual's intellectual property for Defendants' own benefit, while depriving the individuals of any benefits of their own property.

## APPLICABLE LAW TO ALL COUNTS

35. According to the Montana Supreme Court, the doctrine of *respondeat superior* is when "the consequences of one person's actions may be attributed to another person."  Denke v. Shoemaker, 2008 MT 418, ¶ 73, 347 Mont. 322, 198 P.3d 284.  This doctrine will be imposed upon an employer when an employee is acting "within the scope of his or her duties to the employer," which is usually a question of fact, but becomes a question of law

for the court when "only one legal inference may reasonably be drawn from the facts." <u>Denke,</u> at ¶ 74.

36. In this case, Defendant Company 911 Datamaster is the employer of the individual defendants Scott Krehbeil and Eric Regnier, and is liable for any actions taken by those individuals in the scope of their employment.  For the purposes of this case, any wrongful discharge claims laid against Defendants Krehbeil or Regnier are for actions taken within the scope of their employment.

37. The actual fraud claim against Defendants Krehbeil and Regnier are for actions taken outside the scope of their employment.

## COUNT ONE — WRONGFUL DISCHARGE

38. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

39. In Montana, the Wrongful Discharge from Employment Act (WDEA) is the sole remedy for a wrongful discharge.

40. "Montana has chosen to protect the rights of a worker to challenge the validity of an employer's decision to terminate his or her employment.  While Montana law still provides that, absent provisions to the contrary, employment is 'at will,' under the Wrongful Discharge From Employment Act, an employer in most cases must have good cause to fire an employee." <u>Jarvenpaa v. Glacier Elec. Co-op., Inc.</u>, 271 Mont. 477, 480, 898 P.2d 690, 692 (1995).

41. The WDEA defines "discharge" as "termination of employment, including resignation, elimination of the job, layoff for lack of work, failure to recall or rehire, and any other cutback in the number of employees for a legitimate business reason."  Mont. Code Ann. § 39-2-903(2).  A "legitimate business

reason" is a reason "that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." Andrews v. Plum Creek Mfg., LP., 2001 MT 94, ¶ 18, 305 Mont. 194, 27 P.3d 426.

42. A discharge is wrongful under the WDEA if "it was not for good cause and the employee had completed the employer's probationary period of employment; or the employer violated the express provisions of its own written personnel policy." Mont. Code Ann. § 39-2-904(1)(b)&(c). "Good cause" is defined as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reasons." Mont. Code Ann. § 39-2-903(5).

43. In determining good cause, courts balance an employer's right to employ who they want, with an employee's legitimate interest in maintaining secure employment. Buck v. Billings Montana Chevrolet, Inc., 248 Mont. 276, 281, 811 P.2d 537, 540 (1991). "The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business." Johnson v. Costco Wholesale, 2007 MT 43, ¶ 23, 336 Mont. 105, 152 P.3d 727.

44. The WDEA "provides the exclusive remedy for a wrongful discharge * from employment." Great Falls Clinic LLP v. Montana Eighth Jud. Dist. Ct., ¶ 10, 381 P.3d 550, 552–53, 385 Mont. 95, 381 P.3d 550, 41 IER Cases 1271, 2016 MT 245 (citing Blehm v. St John's Lutheran Hospital, 2010 MT 258, ¶¶ 18–19, 358 Mont. 300, 246 P.3d 1024); § 39–2–902, MCA. The Act applies to an "employee," who is "a person who works for another for hire." Great Falls Clinic LLP., ¶ 10; Mont. Code Ann. 9–2–903(3).

45. The Wrongful Discharge Act applies when an employer discharges an employee from employment. Great Falls Clinic LLP, ¶ 12.

46. If an employer perpetrates a wrongful discharge the employee may be awarded wages and fringe benefits for a maximum of four years, less any interim earnings. Mont. Code Ann. § 39–2–905(1); Cromwell v. Victor School Dist., 2006 MT 171, ¶ 22, 333 Mont. 1, 140 P.3d 487.

47. There is a right to damages for pain and suffering, emotional distress, compensatory damages, punitive damages, and other form of damages, provided they fall within the provisions of the Act. Mont. Code Ann. § 39–2–905;  Great Falls Clinic LLP v. Montana Eighth Jud. Dist. Ct., 381 P.3d 550, 552–53, 385 Mont. 95, 381 P.3d 550, 41 IER Cases 1271, 2016 MT 245.

48. "Good cause" is defined as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reasons."  Mont. Code Ann. § 39-2-903(5).

49. If a probationary period is not specified, a six-month period from the date of hire is presumed.  "If an employer does not establish a specific probationary period or provide that there is no probationary period prior to or at the time of hire, there is a probationary period of 6 months from the date of hire."  Mont. Code Ann.  39-2-9(2)(b).

50. In this case, Defendant did not specify to Mr. Weinberger that he would be subject to a specific probationary period, or what Defendant's standard probationary period was.  Mr. Weinberger worked for Defendant for 5 years. Therefore, Mr. Weinberger was well past any probationary period at the time of his unlawful discharge.  Mont. Code Ann.  39-2-9(2)(b).

51. Here, Mr. Weinberger was terminated under the guise of Defendant wanting to have a full-time coder, (see Notice of Determination, p.1, August 1, 2017,

ATTACHED, hereinafter Exhibit 1) but the actual reason was so that 911 Datamaster could misappropriate Mr. Weinberger's intellectual property for their own enrichment. <u>Affidavit of Lawrence Weinberger</u>, ¶ 50, May 3, 2018. This is not "reasonable job-related grounds for dismissal." Mont. Code Ann. § 39-2-903(5).

52. There are no other legitimate business reasons supporting good cause for Mr. Weinberger's termination. <u>Id</u>. "Legitimate business reasons" are reasons that are "neither false, whimsical, arbitrary or capricious" and they must have "some logical relationship to the needs of the business." <u>Andrews</u>, ¶ 18. Any ascertainable reasons for Defendant's discharge of Mr. Weinberger are not legitimate business reasons.

53. Mr. Weinberger's dismissal was not termination for good cause. His termination by Defendant was wrongful and in violation of the WDEA and Montana law.

54. Defendants are liable for wrongful discharge.

## COUNT TWO — ACTUAL FRAUD

55. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

56. At common law, a party asserting a claim of actual fraud must establish: 1) a representation, 2) the falsity of the representation, 3) the materiality of the representation 4) the speaker's knowledge of the representation's falsity or ignorance of its truth, 5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated, 6) the hearer's ignorance of the representation's falsity, 7) the hearer's reliance upon the truth of the representation, 8) the hearer's right to rely upon the representation, and 9) the hearer's consequent and proximate injury or

damages caused by their reliance on the representation.  <u>Morrow v. Bank of America, N.A.</u>, 2014 MT 117, ¶ 57, 357 Mont. 38, 324 P.3d 1167.

57. "A misrepresentation is material if it is of such character that if it had not been misrepresented, the transaction would not have been consummated." *Sevin v. Kelshaw*, 417 Pa. Super. 1, 10, 611 A.2d 1232, 1237 (Pa. Super. Ct. 1992).

58. A party does not have a right to rely on a representation if she is aware the representation is false, not enforceable, or not made to her. *Lininger v. Sonenblick*, 23 Ariz. App. 266, 268, 532 P.2d 538, 540 (1975).

59. Defendant Krehbil made a representation to Mr. Weinberger that Datamaster wanted to hire him long term, and would keep him employed until he retired despite any disabilities Mr. Weinberger might have had.  Defendant's also assured Mr. Weinberger that reasonable accommodations would be made in order for him to perform his job duties, including working reduced hours. These representations were false.  Defendants intended to secure Mr. Weinberger's services as an employee in order to obtain his intellectual property and did not intend to retain Mr. Weinberger as an employee, nor did they intend to accommodate his disability once they gained access to Mr. Weinberger's intellectual property.  This is evidenced by Defendant Krehbil's conversation with Mohammed Habib about Datamaster's plan to hire Mr. Weinberger, misappropriate his intellectual property, and then fire him in order to prevent Mr. Weinberger from utilizing his own intellectual property for his own benefit. <u>Aff. Lawrence Weinberger</u>, ¶ 50.

60. Defendant Krehbil's representation was material. If he had not represented to Mr. Weinberger that the job offer existed, that Mr. Weinberger's disability would be accommodated, and that he would have a secure retirement, Mr. Weinberger would not have accepted Datamaster's offer of employment.

61. Defendants also represented to Mr. Weinberger that he would retain the rights to his own intellectual property. If Mr. Weinberger had known Defendants intended to misappropriate his intellectual property for their own use and deprive him of its use and value, he would never have accepted their offer of employment.

62. Defendant's representation to Mr. Weinberger was false when it was made, and the makers of the representation were aware of this falsity. Their intent was to defraud Mr. Weinberger and misappropriate his intellectual property. Defendants had no intention in retaining Mr. Weinberger once they had secured the SpacialStation 911 system software he developed, and they had no intention of allowing Mr. Weinberger to retain the rights to his intellectual property. Furthermore, Defendants intended that Mr. Weinberger act upon this representation in the exact manner he did by accepting the offer of employment and by developing the SpacialStation program when working for them.

63. Mr. Weinberger had no idea this representation was false, and had no way of determining that that this representation was false at the time he accepted the offer of employment and began working for Defendants. He did not learn of the falsity of the representation until Mr. Habib informed him of Defendants intentions in August of 2017. Mr. Weinberger relied upon the truth of Defendants representation of the legitimacy of the job offer and the accompanying offer of accommodations when he accepted the position.

64. Mr. Weinberger had the right to rely upon Defendants' representation. This representation was made to him specifically. He was not aware that is was false. Nor was this representation unenforceable.

65. Mr. Weinberger was injured by Defendant's misrepresentation. He accepted a job offer that was not a legitimate offer of employment and subsequently

lost this job due to Defendants' actions.  Mr. Weinberger lost the salary he earned while working for Datamaster.  He also lost access to his intellectual property that he possessed prior to working for Datamaster.  Due to Defendants' placement of Mr. Weinberger's intellectual property into the public domain, Mr. Weinberger no longer has the ability to patent his invention, and has lost all monetary value from his invention.  35 U.S.C. § 102.

66. Defendants are liable for actual fraud.

## COUNT THREE — ACTUAL MALICE

62. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

63. Punitive damages are justifiable in this case.

64. If an employer perpetrates a wrongful discharge, "the employee may be awarded lost wages and fringe benefits for a period not to exceed 4 years from the date of discharge, together with interest on the lost wages and fringe benefits." Mont. Code Ann. 39-2-905(1).

65. An employee may recover punitive damages if the employer acted with actual fraud or malice.  "The employee may recover punitive damages otherwise allowed by law if it is established by clear and convincing evidence that the employer engaged in actual fraud or actual malice in the discharge of the employee in violation of 39-2-904(1)(a)." Mont. Code Ann. 39-2-905(2).

66. Actual malice exists for the purposes of awarding punitive damages in a non-contract action if a defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and he "(1) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury, or (2) deliberately proceeds to act with indifference

to the high probability of injury."   Mont. Code Ann. 27-1-221, <u>Trifad Entertainment, Inc. v. Anderson</u>, 2001 MT 227, ¶ 53, 306 Mont. 499 36 P.3d 363.

67. The elements of punitive damages must be supported by clear and convincing evidence. "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." <u>Id.</u> ¶ 54.

68. Punitive damages may be awarded where "the nature of the wrong complained of and injury inflicted goes beyond merely violating the rights of another and is found to be willful and malicious." <u>Id.</u>

69. A jury may award exemplary damages when defendant has been guilty of either actual or implied malice, and implied malice may be shown by proof that defendant engaged in a course of conduct knowing it to be harmful or unlawful.   <u>Lauman v. Lee</u>, 192 Mont. 84, 626 P.2d 830 (1981).

70. Defendant's state of mind represents a key element in determining whether a defendant acted with actual fraud or actual malice, for purposes of punitive damages.   <u>Sunburst School Dist. No. 2 v. Texaco, Inc.</u>, 2007 MT 183, 338 Mont. 259, 165 P.3d 1079.

71. In this case, Defendants made their plans perfectly clear: Eric Regnier, one of the co-owners of Defendant Company, told another company employee, Mohammed Habib, that defendant company Datamaster would hire Mr. Weinberger, get him to develop his intellectual property and software design, and then once that occurred, they wouldn't need Mr. Weinberger anymore, so then they would fire him and keep his intellectual property and software design for themselves.   <u>Aff. Lawrence Weinberger</u>, ¶ 50.  This constitutes "deliberately proceed[ing] to act in conscious or intentional disregard of the high probability of injury."  MCA 27-1-221(1).

72. Additionally, there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence; Defendant's intended to create a false employment offer in order to misappropriate the valuable intellectual property of Mr. Weinberger, thus depriving him of his own intellectual property for Defendant's own monetary gain.  When Defendant Regnier was questioned about the ethics and legality of this course of action, Defendant Regnier did not answer.  Aff. Lawrence Weinberger, ¶ 50.  This constitutes clear and convincing evidence.

73. Exemplary damages are appropriate here because Defendants engaged in a course of conduct knowing it to be harmful or unlawful, and a jury could moist likely find that Defendants are guilty of either actual or implied malice.

74. Defendants acted with actual malice, therefore, punitive damages are appropriate.

## COUNT FOUR — VIOLATION OF THE AMERICANS WITH DISABILITES ACT AND MONTANA DISABILITY STATUTES

75. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

76. Although in Montana the Wrongful Discharge from Employment Act is the exclusive remedy for wrongful discharge, it provides an exception for claims for damages that are subject to other statutes that prohibit discharge.  Mont. Code Ann. §§ 39-2-902  "The statutes include those that prohibit discharge for filing complaints, charges, or claims with administrative bodies or that prohibit unlawful discrimination based on ... disability ... and other similar grounds." Mont. Code Ann. § 39-2-912(1).

77. Montana statute also explicitly prohibits discrimination based on disability. "It is unlawful to discriminate, in hiring or employment, against a person because of the person's physical disability." Mont. Code Ann. § 49-4-101.

78. The ADA allows a person who has been discriminated against on the basis of disability to file a claim through with the U.S. Equal Employment Opportunity Commission, and then once a Notice of Right to Sue has been issued, a suit must be filed within 90 days of the Notice.

79. The term "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. 126 § 12111(8).

80. A disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. 126 § 12102(1)(A)-(C). Major life activities include, but are not limited to … performing manual tasks, … walking, standing, lifting, bending, … learning, reading, concentrating, thinking, communicating, and working. Id. (2)(A).

81. Reasonable accommodations "may include job restructuring, part-time or modified work schedules, … reassignment to a vacant position, … and other similar accommodations for individuals with disabilities. Id. (9)(B).

82. "No [employer] shall discriminate against a qualified individual on the basis of disability in regard to … discharge of employees, employee compensation, and other terms, conditions, and privileges of employment." Id. § 12112(a).

83. Discriminating against a qualified individual on the basis of disability includes "not making reasonable accommodations to the known physical … limitations of an otherwise qualified individual with a disability who is an …

employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or denying employment opportunities to [an] employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical … impairments of the employee …." Id. (5) (A)-(B).

84. "The court … in its discretion, may allow the prevailing party … a reasonable attorney's fee, including litigation expenses, and costs … ." Id. § 12205.

85. In this instance, Mr. Weinberger is a qualified individual with a disability, and he meets the exception for claims for damages that are subject to other statutes that prohibit discharge. 42 U.S.C. 126 § 12111(8), 42 U.S.C. 126 § 12102(1)(A)-(C), 42 U.S.C. 126 § 12102(2)(A), Mont. Code Ann. §§ 39-2-902.

86. Defendants unlawfully fired Mr. Weinberger for the stated reason of not being able to work 40 hour weeks due to his disability.  Exhibit 1, p. 1, August 11, 2017, Mont. Code Ann. § 49-4-101, 42 U.S.C. 126 § 12112(a), 42 U.S.C. 126 § 12112(5)(A)-(B).

87. Mr. Weinberger informed Defendants about his disabilities before agreeing to go work for them as an employee, and Defendant's assured Mr. Weinberger that they would made accommodations for him.  Emails, Aff. Lawrence Weinberger, ¶¶ 22, 36-42.

88. Defendants impermissibly lowered Mr. Weinberger's salary on the basis of his disability in violation of 42 USC 126 § 12112(a).  Aff. Lawrence Weinberger, ¶ 40.

89. Defendants impermissibly failed to make reasonable accommodations for Mr. Weinberger. 42 USC 126 § 12112(a).

90. Given the nature and cost of the accommodation needed; the financial resources of the facility; the effect on expenses and resources; the size of the business; and the type of operation, when weighed against the value of Mr. Weinberger's work product; and the inability of any other developers to create the required algorithms and software programs, a further reduced work schedule would not have created an undue hardship for Defendants. 42 U.S.C. 126 § 12111(10).  Additionally, Defendants stated that Mr. Weinberger could simply move into a "wizard" position, where he basically oversaw the other developers, but they did not allow him to do so. <u>Aff. Lawrence Weinberger</u>, ¶ 38.

91. Defendant's then impermissibly terminated Mr. Weinberger based on the reasons stated by Defendants in the <u>Determination</u>. <u>Ex. 1</u>, p. 1. "No [employer] shall discriminate against a qualified individual on the basis of disability in regard to ... discharge of employees, employee compensation, and other terms, conditions, and privileges of employment."  42 U.S.C. 126 § 12112(a).

92. A request for a Notice of Right to Sue has been filed with the Equal Employment Opportunity Council (EEOC).  Mont. Code Ann. § 39-2-912(1).

93. Defendant's actions were impermissible, fraudulent, and perpetrated with actual malice, and Mr. Weinberger has been damaged due to these actions. Because of Defendant's malicious actions that resulted in Mr, Weinberger's harm, this Court should award Mr. Weinberger reasonable attorney's fees including litigation expenses and costs. 42 U.S.C. 126 § 12205.

94. Defendant's are liable for violations of the Americans With Disabilities Act, and Montana statutes.

### COUNT FIVE — INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

95. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

96. A party asserting a claim of intentional interference with a prospective economic advantage must show that the defendant committed acts that are: 1) intentional and willful, 2) are calculated to cause damage to the plaintiff's business, 3) are done with the unlawful purpose of causing damage or loss, without right or justifiable cause of the part of the actor, and 4) result in actual damages or loss.  Maloney v. Home and Investment Center, Inc., 2000 MT 34, ¶ 41, 298 Mont. 213, 994 P.2d 1124.

97. Under this theory, "a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, is protected from a third person's wrongful conduct which is intended to disrupt the relationship."  Id. (citing Ellis v. City of Valdez, 686 P.2d 700, 707 (Alaska, 1984)).

98. The definition of the plaintiff's "business" includes the "reasonable expectation of entering into a valid business relationship." Id. (citing Cook v. Winfrey, 141 F.3d 322, 327 (7th Cir., 1998)).

99. Defendants willfully misappropriated Mr. Weinberger's algorithms used to create the SpacialStation program, preventing Mr. Weinberger from making use of or marketing a similar program himself.  When Mr. Weinberger accepted Defendants' offer of employment, both parties agreed Mr. Weinberger would retain the rights to his intellectual property.  Accordingly, Defendants had no lawful right to Mr. Weinberger's algorithms and their actions caused Mr. Weinberger to lose the value of his invention. Defendants' use of Mr. Weinberger's intellectual property has placed it within the public domain, and Mr. Weinberger may no longer apply for a patent.

Due to Defendants' actions, Mr. Weinberger was not able to retain his invention for his own use, to place it on the market at large, or to enter into a business relationship with another entity for the marketing of his invention.

100. Defendants' misappropriation of Mr. Weinberger's invention disrupted Mr. Weinberger's reasonable expectations for entering into other business relationships involving the marketing and sale of his intellectual property.

101. Defendants intentionally interfered with Mr. Weinberger's prospective economic advantage.

## COUNT SIX — UNJUST ENRICHMENT

102. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

103. Unjust enrichment is "[t]he retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected." Lemond v. Yellowstone Development, LLC, 2014 MT 181, ¶ 48, 375 Mont. 142, 336 P.3d 346.

104. The theory of unjust enrichment requires that a person who has been unjustly enriched at the expense of another must make restitution to the other . . .[t]he measure of this equitable restitution interest is either the quantum meruit value of the plaintiff's labor and materials or the value of the enhancement to the defendant's property. Id.

105. Unjust enrichment is an obligation created by law in the absence of an agreement between the parties. Well v. Twin Hearts Smiling Horses, Inc., 2016 MT 347, ¶ 33, 386 Mont. 98, 386 P.3d 937. Courts have applied the doctrine of unjust enrichment when a contract in law is implied. Id.

106. Defendants have made use of Mr. Weinberger's SpacialStation software in this instance, by placing into on the market for their own profit. Mr.

Weinberger's intellectual property has been on the market for over a year. Pursuant to American patent law, Mr. Weinberger can no longer apply for a patent to this intellectual property.  His computer algorithms are no longer eligible for copyrighting.  His invention is now within the public domain. *Helsinn v. Teva* (Fed. Cir. 2017).

107. Defendants retained the benefit of Mr. Weinberger's computer algorithms. Defendants never financially compensated Mr. Weinberger for the value of his computer algorithms.  As the inventor of the algorithms, Mr. Weinberger has the right to be compensation, were he to agree to sell the rights to them. Mr. Weinberger has the right to restitution in the amount of the value his invention has conferred upon Defendants' business.

108. Defendants are liable for unjust enrichment.

## COUNT SEVEN — NEGLIGENT SUPERVISION AND RETENTION OF EMPLOYEES

109. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

110. Although the Montana Supreme Court has referenced the torts of negligent hiring, retention, and supervision, it has yet to explicitly discuss them in depth.  *See* Saucier ex rel. Mallory v. McDonald's Restaurants of Mont., Inc., 2008 MT 63, 179 P.3d 481 (Court declined ruling on the tort claim because it was a sexual harassment case, placing it under the MHRA); Bruner v. Yellowstone County, 272 Mont. 261, 900 P.2d 901 (1995);  Hoffman v. Austin, 2006 MT 289, 147 P.3d 177 (overruled on other grounds); Pablo v. Moore, 2000 MT 48, 995 P.2d 460. *See also* Peschel v. City of Missoula, 664 F.Supp.2d 1149 (D. Mont. 2009).

111. In <u>Bruner</u> — a case that was focused on whether the sole remedy for sexual harassment was found in the MHRA — Justice Leaphart, in his dissent, stated that he would explicitly recognize the separate tort of negligent retention in Montana.  "When, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his [or her] unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." 272 Mont. at 269, 900 P.2d at 906 (quoting <u>Yunker v. Honeywell</u>, 496 N.W.2d 419, 423 (quoting <u>Garcia v. Duffy</u>, 492 So.2d 435, 438-39 (Fla.Dist.Ct.App. 1986))).  In <u>Vollmer v. Bramlette</u>, the Federal District Court for the District of Montana concluded that an employer has a duty to protect his or her employees from foreseeable employee-caused harms.  That court concluded that in the negligent hiring context, "the question of foreseeability, such as which would give rise to a duty of the employer, is a question of fact not properly disposed of by summary judgment." 594 F.Supp. 243, 248 (1984). The basis of responsibility under the doctrine of negligent hiring is the master's own negligence in hiring or retaining in his employ an incompetent servant whom the master knows or by the exercise of reasonable care should have known was incompetent or unfit and thereby creating an unreasonable risk of harm to others.  <u>Estate of Arrington v. Fields</u>, 578 S.W. 2d 173, 178 (Tex.Civ.App.1979); <u>Bruner</u>, 272 Mont. at 269-270, 900 P.2d at 906.

112. In this case, the individual Defendant Krehbeil made it clear to others that he intended to perpetrate fraud by hiring Mr. Weinberger and taking Mr. Weinberger's intellectual property for Defendant Company's own benefit. <u>Affidavit of Lawrence Weinberger</u>, ¶ 50, may, 3, 2018.  Defendants showed a

continuing course of conduct by doing the same thing again to Mohammed Habib. Aff. Lawrence Weinberger, ¶¶ 48-49.

113. But for Defendant Company's negligent supervision, Mr. Weinberger would not have been harmed.

114. Defendant Company is liable for negligent supervision and retention of employees.

## COUNT EIGHT — BREACH OF CONTRACT

115. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

116. Under Montana law, a contract is defined as an agreement to do or to not do a certain thing.  Mont. Code Ann. § 28-2-101.  Plaintiffs must establish four elements to prove the existence of a contract: "(1) identifiable parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration." Mont. Code Ann. § 28-2-102.  In the case of contractual obligations, there is also a statutorily implied covenant of good faith and fair dealing, which translates as honesty in fact and reasonable commercial standards of fair dealing in trade.  Mont. Code. Ann. § 28-1-211.

117. In this case, there is no question that there is a contract.  The thing agreed to by the parties was that Mr. Weinberger would bring his knowledge, experience, and intellectual property to bear as an employee in return for Defendants providing him with a job and certain benefits including but not limited to:

    1)  A yearly salary of $115,000;

    2)  Yearly cost of living raises of 3%;

    3)  Yearly bonuses of approximately $10,000;

4) Disability insurance;

5) A secure job devoid of the stress of being fired;

6) A secure retirement sufficient for him to live out the remainder of his life comfortably; and,

7) Mr. Weinberger was to retain ownership of his own design.

Aff. Lawrence Weinberger, ¶ 25.

118. The parties are identifiable — Defendant Company 911 Datamaster and Plaintiff Lawrence Weinberger. They are legally and actually capable of contracting. There was clearly consent, since all parties to the agreement provided consideration. The object — software algorithms and programs created with Mr. Weinberger's personal knowledge and intellectual property in return for, but not limited to, a secure job including secure retirement benefits as well as retention of the ownership of his own design — is unarguably lawful, and sufficient consideration, as stated above.

119. Defendant breached this contract by firing Mr. Weinberger without cause, or in the alternative, fraudulently taking Mr, Weinberger's intellectual property for their own benefit and depriving Mr. Weinberger of its benefits, and in either event, depriving Mr. Weinberger of the benefit of his bargain — a secure job with secure retirement benefits as he was promised by Defendant Company.

120. Defendant Company did not follow though with its contractual obligations:

1) Mr. Weinberger's salary was reduced from $115,000 yearly to 90,000;

2) In over five years, Mr. Weinberger received only one cost of living raise instead of the five he was promised;

3) In over five years, Mr. Weinberger received only three bonuses instead of the five he was promised;

4) Mr. Weinberger did not receive any disability benefits until two years after going to work for Defendant Company.

5) Mr. Weinberger was wrongfully discharged, even though Defendant Krehbeil assured him that no-one had ever been fired from Datamaster in over 20 years of operation.

6) Mr. Weinberger's retirement benefits stopped when he was wrongfully terminated.

7) Mr. Weinberger was not able to retain his own design, because Defendant Company misappropriated it for their own use, and deprived Mr. Weinberger of the ability to patent it.

Id., ¶¶ 24, 26, 27

121. Therefore, Defendants breached their contract with Mr. Weinberger.

122. Defendants are liable for breach of contract.

## COUNT NINE — BREACH OF OBLIGATION OF GOOD FAITH AND FAIR DEALING

123. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

124. "Every contract, regardless of type, contains an implied covenant of good faith and fair dealing." Story v. City of Bozeman, 242 Mont. 436, 450, 791 P. 2d 767, 775 (1990). "In essence, the covenant is a mutual promise implied in every contract that the parties will deal with each other in good faith, and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance." Beaverhead Bar Supply v. Harrington, 247 Mont. 117, 124, 805 P.2d 560, 564 (1991); citing Story, 242 Mont. at 450, 791 P.2d at 775; citing Restatement (Second) of Contracts § 205 cmt. a (1981) ('Good faith performance or enforcement of a contract

emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party....')" Phelps v. Framton, 2007 MT 263, ¶ 29, 339 Mont. 330, 170 P.3d 474.

125. The Wrongful Discharge from Employment Act is "the exclusive remedy for a wrongful discharge from employment," which means that "no claim for discharge may arise from tort or express or implied contract." Mont. Code Ann. §§ 39-2-902 and 39-2-913.  The Montana Supreme Court has held that this bars all claims for wrongful discharge based on common law tort or express contract. Kneeland v. Luzenac America, Inc., 1998 MT 136, ¶ 27, 289 Mont. 201, 961 P.2d 725.  Furthermore, Mont. Code Ann. § 39-2-905(3), states: "There is no right under any legal theory to damages for wrongful discharge under this part for pain and suffering [or] emotional distress...." Hence, the WDEA disallows tort and contract claims arising from the discharge, but does not bar claims arising within the circumstances of employment separate and independent from the discharge.  Beasley v. Semitool, Inc., 258 Mont. 258, at 262, 853 P.2d 84 at 86 (1993).

126. As held in Story, a breach of the underlying contract is not a prerequisite to a breach of the implied covenant of good faith and fair dealing.

127. In this case, there was an employment contract between Defendant and Mr. Weinberger, and Defendant did not abide by the obligation of good faith and fair dealing in the underlying implied contract.  Defendant did not deal with Mr. Weinberger in good faith.  Defendant company, by and through its employees, deprived Mr. Weinberger "of the benefits of the contract through dishonesty or abuse of discretion in performance." Beaverhead Bar Supply, 247 Mont. at 124, 805 P.2d at 564 (1991).  The benefits of the implied covenant of good faith and fair dealing includes being treated fairly and consistently, having any concerns or issues addressed in an even-handed

way  Defendants deprived Mr. Weinberger of these benefits through its abuse of discretion in performance as Mr. Weinberger's supervisor.

128. Mr. Weinberger had a "justified expectation" that Defendants would treat his fairly and consistently. Because they did not, Defendants breached their obligations of good faith and fair dealing.  Phelps, ¶ 29.

129. Defendants are liable for breach of obligation of good faith and fair dealing.

## COUNT TEN — CONVERSION

130. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

131. A plaintiff establishing a claim of conversion must show the following four elements: 1) property ownership by the plaintiff, 2) plaintiff's right of possession of the property, 3) defendant's unauthorized control over the property, and 4) damages.  Fellar v. First Interstate Bancsystem, Inc., 2013 MT 90, ¶ 26, 369 Mont. 444, 299 P.3d 338.

132. Mr. Weinberger owned the rights to his own computer algorithm, which he designed himself.  Mr. Weinberger never relinquished his right to possess his own intellectual property.  When he agreed to work for Defendant Company, he only did so under the circumstances that he would be allowed to retain the rights to his intellectual property.  Defendants have exerted unauthorized control over Mr. Weinberger's intellectual property by disseminating it into the public market and using it in order to sell it for their own profit.

133. Defendants appropriation of the Mr. Weinberger's software algorithms and program has caused Mr. Weinberger damages.  As Mr. Weinberger's invention has already been placed in the public domain, Mr. Weinberger may no longer apply for a patent. The one year grace period within which to seek a patent after public use or sale has already passed.  35 U.S.C. §.102.

Accordingly, Mr. Weinberger has been deprived of the monetary value of a patent for his software algorithms and programs.

134. Defendants are liable for conversion.

## COUNT ELEVEN — MISAPPROPRIATION OF TRADE SECRETS

135. Mr. Weinberger repeats and incorporates by reference each and every statement and allegation contained in all preceding paragraphs as though fully set forth in this section.

136. Montana statute defines misappropriation of a trade secret as: (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was: (A) derived from or through a person who had used improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.  Mont. Code Ann. § 30-15-402(2).

137. Montana statute defines improper means as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" Mont. Code. Ann. § 30-14-402(1).

138. A plaintiff seeking relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist. <u>Imax Corp v. Cinema Technologies, Inc.</u>, 152 F.3d 1161, 47 U.S.P.Q.2d 1821 (9th Cir).

139. Defendants acquired Mr. Weinberger's algorithm by improper means. Defendants misrepresented their intentions to Mr. Weinberger when they made him an offer of employment. Defendants represented to Mr. Weinberger he would be allowed to retain the rights to his intellectual property. Defendants did not inform Mr. Weinberger they only intended to hire him in order to acquire his algorithm and that his employment would be terminated once Defendants had acquired his intellectual property.

140. Defendants made use of Mr. Weinberger's intellectual property without his express or implied consent. Mr. Weinberger only agreed to accept Defendants' offer of employment and to further develop his program while working for Defendants on the condition he retained the rights to his intellectual property.

141. Due to the nature of Defendants agreement with Mr. Weinberger, Defendants right to the use of Mr. Weinberger's intellectual property was limited.

142. Mr. Weinberger's algorithm conferred a competitive business advantage upon him because it was not known to his competitors. Defendants obtained access to Mr. Weinberger's algorithm improperly, by means of theft and fraud.

143. Defendants are liable for misappropriation of trade secrets.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lawrence Weinberger moves this Court to grant judgment as follows:

1. Damages, including compensatory, general, and punitive damages, as determined by the Court to be just and necessary under the circumstances;
2. Award four years-worth of lost wages as provided for by Montana statute;
3. Award punitive damages;
4. Find that the punitive damages cap is unconstitutional in this case;
5. Award all fees incurred litigating this matter, including but not limited to court costs, attorney's fees, and attorney's costs; and,
6. Any such other relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Lawrence Weinberger demands a trial by jury of all triable issues as a right by jury, pursuant to Mont. Rule of Civ. Pro. 38.

RESPECTFULLY submitted this 23rd day of May, 2018.

Kai N. Puhrmann
Lowy Law, P.L.L.C.
2419 Mullan Rd, Suite B
Missoula, Montana 59808
(406) 926-6500
Kai@LowyLawFirm.com

*Attorney for Plaintiff, Lawrence Weinberger*

RECEIVED
MAY 07 2018

Matthew B. Lowy, Child Welfare Law Specialist (NACC)
Lowy Law, P.L.L.C.
2419 Mullan Rd, Suite B
Missoula, Montana 59808
(406) 926-6500
documents@LowyLawFirm.com

*Attorney for Plaintiff, Lawrence Weinberger*

## MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

LAWRENCE WEINBERGER,

    Plaintiff,

    v.

911 DATAMASTER, a Foreign Limited Liability Company, SCOTT KREHBEIL individually, ERIC REGNIER individually, JOHN DOES I-XX, and ABC CORPORATIONS I-XX,

Cause No.

Department No.

Judge

**AFFIDAVIT OF LAWRENCE WEINBERGER**

The undersigned, Lawrence Weinberger, being duly sworn, hereby declares, under penalty of perjury, that the following information is true and correct:

1. I am over 18 years of age and am a resident of the State of Montana. I have personal knowledge of the facts herein and, if called as a witness, could testify completely thereto:

2. I have a long history of health issues. During the first 25 years of my life, I injured my neck with a dive into the shallow end of a swimming pool and later a car accident. As the years went by, what began as a stiff neck evolved into a more serious condition.

AFFIDAVIT OF LAWRENCE WEINBERGER

3. In the late 1990s, I developed pain in my back, shoulders, and arms, with numbness and tingling in my hands and fingers.

4. In 1999 or 2000, I had my first MRI which revealed Degenerative Disc Disease. I opted for physical therapy and steroid injections over surgery, but the pain persisted and only grew worse. I continued to try to power through for the next ten years.

5. 2003, I began designing and developing a new software product called MapSAG for Contact One.

6. This product has been and is still used by 911 agencies across the country. Customers include agencies such as Maricopa County Fire Department in Phoenix, AZ, and the Los Angeles County Fire Department. Greater Harris County, which includes Houston, Texas is a customer. This is the fifth most populated metropolitan area in the United States.

7. In 2007, after more than four years building MapSAG from the ground up, I decided to leave Contact One for a couple of reasons.

8. Due to ongoing health issues and my long history of chronic health problems, I doubted that I would be able to work until normal retirement age.

9. Therefore, I decided that I would look for a job that offered long-term disability insurance, as Contact One did not offer this.

10. I had also decided that I would continue to develop my software product with the intent of eventually selling it for an amount that would comfortably carry me through my retirement years.

11. I continued to work on my software product independently, and while doing so, I found a job that offered disability insurance and so I left Contact One for a position with Power Engineers.

AFFIDAVIT OF LAWRENCE WEINBERGER                                        2 of 9

12. For several years, my health continued to degenerate, but I was able to continue working despite it.  The pain in my neck, back, shoulders, and arms continued to mount, as well as worsening numbness and tingling in my hands.

13. 2010 I underwent another MRI, revealing the discs in my spine had continued to deteriorate.  Surgery was my only remaining option.

14. 2010 I underwent surgery to fuse vertebrae together in my neck.  The degeneration of my neck actually required that three vertebrae be fused instead of just two as the doctors had initially thought.  The numbness and tingling in my hands did not improve, and I tested positive for Double Crush Syndrome in both hands.  This meant the nerves in the fingers were crushed in two places — the neck and wrist.  I had surgery on both wrists.

15. These surgeries gave me some relief from my symptoms, but only for a few years.  Carpal Tunnel Syndrome can return after surgery, and additional spine issues after fusion is not uncommon.  It soon became apparent that I was experiencing both.

16. Mid-2011, I received a call from Jerry Steenson, one of the co-owners of Contact One.  He and I had kept in contact over the years, but I was surprised to hear that Contact One had sold MapSAG to a company called Intrado for $7.5 million dollars, based on the success of the product I had created.

17. Since the early days of MapSAG, Contact One had worked cooperatively with a company named 911 Datamaster.  Datamaster offered products and services in an area known as "Traditional 911," while Contact One offered products and services in "Next Generation 911" (NG911).  Intrado was Datamaster's largest competitor, leaving Datamaster in a position of

AFFIDAVIT OF LAWRENCE WEINBERGER

competing against its former partner.  Furthermore, most projects up for bid required both Traditional 911 and NG911 in tandem, meaning Datamaster could not even compete in the bidding.

18. Therefore, without my intellectual property, Datamaster was essentially going to be out of business, or at the very least, lose a significant portion of their market share.

19. Around the end of 2011, Scott Krehbiel — president, CEO, and co-owner of Datamaster — contacted me about a new project.  Datamaster was interested in designing and developing a new product to compete with MapSAG.

20. Scott knew me well from my time with Contact One, and knew the value of my intellectual property.  We had worked together multiple times and he was very familiar with me and my work.

21. We arranged for me to work with two of Scott's developers — Babu Cherion and Mohammed Habib — to help guide and teach them in the process of building a new NG911 product for Datamaster so they could continue to be competitive in the 911 arena.

22. January 2012 I began this work.  The work progressed slowly, and Scott soon began talking about hiring me as a full-time employee.  I had long wished to attempt a new NG911 system, but I was concerned about the benefits package at Datamaster.  I explained to Scott that I absolutely had to have disability insurance through my employer. At that point I did not describe my health issues very specifically, but I told Scott that they were primarily mechanical and non-life-threatening.

23. Scott promised me that Datamaster would add disability insurance to the benefits package if I came on board.

AFFIDAVIT OF LAWRENCE WEINBERGER

24. Datamaster did not add this insurance until about two years later, in approximately 2014.

25. Scott and I agreed on a starting salary of $115,000 yearly; with medical, dental, vision, life, and disability insurance; as well as four weeks per year paid vacation, two weeks per year sick leave, and 401K matching. Scott also promised an annual bonus and annual cost of living raise, which were to be the same as the other employees at the company: approximately $10,000 in bonus and typically a 3% raise.

26. I did not receive annual bonuses and cost of living raises as promised. In over five years, I received only one raise and three bonuses.

27. I offered to give Scott the rights to my NG911 design in exchange for an ownership position in Datamaster. He rejected this offer, so we agreed that I would retain ownership of my design.

28. Scott requested that I sign a confidentiality agreement with a two-year non-compete clause. I told him that would make me unemployable in 911 across the country. He assured me that it would not matter. He promised me that he would make sure that Datamaster was my last job, meaning that I would retire with enough money to live out the remainder of my life comfortably. He indicated that no employee had ever quit or been fired in Datamaster's 20-year history. Nonetheless, I still did not feel comfortable signing the confidentiality agreement.

29. February 2012 I started at Datamaster. I began building my NG911 design while continuing to mentor Babu and Mohammed. We named this new design "SpatialStation."

30. By the end of 2012, I was able to have the first test version of SpatialStation ready to install with Greater Harris County, our first customer. This replaced

my previous design, MapSAG.  The County was the first of many 911 agencies to replaced MapSAG with SpatialStation.

31. At around this same time, Scott informed me that he was removing Babu and Mohammed from SpatialStation, as they continued to struggle, even under my guidance. Scott admitted that their skill-sets were better suited to the Traditional 911 products.

32. Over the next few years, SpatialStation did very well.  The number of customers purchasing it increased steadily, and Datamaster added a whole new department (NG9-1-1 Services) that used SpatialStation internally.  The size of the company more than doubled.

33. October 2014, Datamaster finally added the new disability insurance they promised me in 2012.

34. Sometime in 2015, Scott informed me that he had fired Mohammed.  I was surprised because Mohammed was by far the best developer on Datamaster's Traditional 911 staff.

35. By the end of 2015, my health issues were once again becoming a hurdle for me.  I was in significant discomfort every day, getting very little sleep, and beginning to suffer from depression.  I struggled to do my work.

36. April 2016 I informed Scott that my health issues were continuing to mount and were interfering with my ability to perform my job duties.  For the first time, I informed him of the specifics of my health issues.

37. Scott indicated understanding and support. See emails from Scott, ATTACHED.

38. Throughout 2016, I continued to communicate with Scott about these issues.  He continued to offer support and to check in with me about my health.  He told me my job was safe.  He asked how he could help.  He suggested that someone else take over the day-to-day development of SpatialStation and I move into the role of

"wizard" (his word) and act as a mentor to other developers. He also offered two me that I could move into part-time work. I told him I would let him know if I needed to take him up on any of these offers.

39. January 2017, I informed Scott that I could no longer continue with my regular job duties and work schedule. He told me this was not a problem.

40. We agreed to reduce my schedule to four days per week, with a reduction in salary of $25,000. No benefits were to change. I would move to the role of wizard and Jay Bohac, another developer who had recently been hired would take over the day-to-day development of SpatialStation.

41. February 2017 I began my new schedule.

42. April 2017 I informed Scott that I needed to reduce my schedule further due to my deteriorating health. We agreed to reduce my schedule to three days per week with no change in salary or benefits.

43. May 2017 I began this new schedule.

44. June 29, 2017 Scott called me and informed me that I was being released from employment with Datamaster. He said he needed a full-time developer, and to stop working immediately. He told me to keep any equipment and tools that I had, and that my salary would be paid through the end of July. My unused vacation time was also to be paid out.

45. Scott told me he had nothing bad or negative to say about me or my work. He said that he would gladly talk about rehiring me if my health situation improved and I was able to return to full-time software development.

46. July 2017 I requested that my unused sick time be paid out. Scott did not respond, but his wife, the vice president of their human resources department, stated that was against company policy.

47. July 2017 I received my final check from Datamaster.

48. August 2017, I called Mohammed Habib, who by this time had been gone from Datamaster for about two years. I had not talked to him since he was fired in 2015. I asked about his experiences with Datamaster.

49. Mohammed said Datamaster owed him money when he left which he was never paid. He said he had received promises of ownership from Scott, but those promises were never fulfilled.

50. Mohammed also told me he was involved in discussions with several owners/managers at Datamaster back when they were talking about hiring me in 2011. He said Eric Regnier (another Datamaster co-owner) had said specifically that they would hire me and get me to develop my design for them, and then they wouldn't need me anymore, so then they would fire me and keep my design. Mohammed said he asked one of the owners if that was moral, ethical, and legal. He said he did not receive an answer to his question.

51. Throughout my time with Datamaster, I did not receive annual bonuses and cost of living raises, as Scott had promised. In over five years, I received one raise and three bonuses. In my final year with Datamaster, I took a $25,000 pay cut because if my health issues.

52. Datamaster continues to use my intellectual property and design for their own benefit and enrichment, with no compensation to me.

Further affiant sayeth naught.

Date: May _3_, 2018          Signature: _____

_Lawrence L. Weinberger_

                                          Printed Name

1  State of ~~Montana~~ *Prg* IDAHO          )

2                                            ): ss

3  County of ~~Missoula~~ *Prg* Gem          )

4  Signed and sworn to (or affirmed) before me on this __3rd__ day of May, 20__18__ by

5  _Lawrence L. Weinberger_

6

7  Signature _Palla R. Garringer_

   Name (*printed*): _Palla R. Garringer_

8  (SEAL)          Notary Public for the State of __ID__

9                  Residing at _Emmett, ID_

10                 My Commission Expires __12/04/2020__

                   mm-dd-yyyy

11  **PALLA R. GARRINGER**
    **NOTARY PUBLIC**

12  **STATE OF IDAHO**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF LAWRENCE WEINBERGER                                    9 of 9

# Exhibit 1






0P1379211          0207162017          M76



**Montana Department of**
**LABOR & INDUSTRY**
Unemployment Insurance Division

PO BOX 8020 HELENA MT 59604-8020
(406) 444-2545
FAX (406) 444-2699
Montana Relay: 711

# NOTICE OF DETERMINATION

08/11/2017

LAWRENCE WEINBERGER
40903 SUNNYVIEW LOOP
POLSON MT 59860

Claimant Name: LAWRENCE
WEINBERGER

ID: 1379211

Claim Effective Date: 07/16/2017
919726M76

You are eligible to receive benefits beginning 07/16/2017, unless you are disqualified or ineligible for another reason.

You were discharged because you were not able to work 40 hours per week as a coder. For six months previous to your discharge, you had been working reduced hours in a position as a mentor and trainer for other coders. After working in this type of position for this time period, this became your new working agreement. You were discharged because the employer wanted to have a fulltime coder. While it is the employer's right to hire and fire for the needs of the business, it has not been shown that your discharge was due to misconduct on your part. An intentional disregard of your obligation to your employer has not been established. Therefore, your discharge was not for misconduct under Sections 39-51-201(19) and 39-51-2303, Montana Code Annotated.

If there are other issues on your claim that might affect your eligibility for benefits, you will receive a separate Notice of Determination for each issue either allowing or denying benefits.

## CLAIMANT AND EMPLOYER REDETERMINATION RIGHTS

This decision is final unless a request for redetermination is filed on or before 08/21/2017. If you disagree with this decision, you have the right to request a redetermination. If you do so, a separate review of the file, and any new information submitted, will be conducted and a redetermination issued. Claimants may file a redetermination request using method 1, 2, 3 or 4 below. Employers may file a request using method 2, 3 or 4.

1. Go to UI4U.mt.gov and select Request Redetermination or Appeal on the Main Menu, or
2. Send a letter, requesting redetermination, to the address at the top of this letter. Explain why you think the decision is wrong. You may also submit any other information you think is relevant to the claim, or
3. Fax your request to the fax number at the top of this letter, or
4. Call your Claims Processing Center at the number on the top of this letter.

**YOU MAY CHOOSE WHICHEVER METHOD YOU WANT, BUT YOU MUST MAKE YOUR REQUEST BY THE DATE INDICATED IN THIS DETERMINATION. If you do not file your request by the date indicated, you must provide good cause to extend the time limit.**




25318500          CEA059

Page 1 of 2

08/10/2017 Form:H07





0P1379211                 0207162017                 M76

CLAIMANT:  You must continue to file your bi-weekly claim information while your redetermination is pending.  In the event of a favorable decision you will be paid benefits for those weeks provided you are otherwise qualified.

Respectfully,
Claims Processing Bureau -- Adjudication Unit
Montana Unemployment Insurance Division

C:
911 DATAMASTER INC
KELLY KREHBIEL
7500 COLLEGE BLVD STE 500
OVERLAND PARK KS 66210 4043

**39-51-201 MCA GENERAL DEFINITIONS**
As used in this chapter, unless the context clearly requires otherwise, the following definitions apply:
(19)(a) "Misconduct" includes but is not limited to the following conduct by an employee:
(i) willful or wanton disregard of the rights, title, and interests of a fellow employee or the employer, including:
(A) insubordination showing a deliberate, willful, or purposeful refusal to follow the reasonable directions, processes, or instructions of the employer;
(B) repeated inexcusable tardiness following warnings by the employer;
(C) dishonesty related to employment, including but not limited to deliberate falsification of company records, theft, deliberate deception, or lying;
(D) false statements made as part of a job application process, including but not limited to deliberate falsification of the individual's criminal history, work record, or educational or licensure achievements;
(E) repeated and inexcusable absences, including absences for which the employee was able to give advance notice and failed to do so;
(F) deliberate acts that are illegal, provoke violence or violation of the law, or violate a collective bargaining agreement by which the employee is covered. However, an employee who engages in lawful union activity may not be disqualified because of misconduct under this subsection (19)(a)(i)(F).
(G) violations of a company rule if the rule is reasonable and if the claimant knew or should have known of the existence of the rule; or
(H) actions by the claimant who, while acting within the scope of employment, commits violations of law that significantly affect the claimant's job performance or that significantly harm the employer's ability to do business;
(ii) deliberate violations or disregard of established employer standards or of standards of behavior that the employer has the right to expect of an employee;
(iii) carelessness or negligence that causes or is likely to cause serious bodily harm to the employer or a fellow employee; or
(iv) carelessness or negligence of a degree or that reoccurs to a degree to show an intentional or substantial disregard of the employer's interest.
(b) The term does not include:
(i) inefficiency, unsatisfactory conduct, or failure to perform well as the result of inability or incapacity;
(ii) inadvertent or ordinary negligence in isolated instances; or
(iii) good faith errors in judgment or discretion.

**39-51-2303 MCA  DISQUALIFICATION FOR DISCHARGE DUE TO MISCONDUCT**
An individual must be disqualified for benefits after being discharged:
(1) for misconduct connected with the individual's work or affecting the individual's employment until the individual has performed services:
(a) for which remuneration is received equal to or in excess of eight times the individual's weekly benefit amount subsequent to the week in which the act causing the disqualification occurred; and
(b) that constitute employment as defined in 39-51-203 and 39-51-204; or
(2) for gross misconduct connected with the individual's work or committed on the employer's premises, as determined by the department, for a period of 52 weeks.




25318500                  CEA059                    08/10/2017 Form:H07