

**FILED**

SEP 0 3 2019

Clerk, U.S District Court
District Of Montana
Missoula

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

LAWRENCE WEINBERGER,

Plaintiff,

vs.

911 DATAMASTER, INC., et al.,

Defendants.

CV 18–134–M–DWM

OPINION and
ORDER

Plaintiff Lawrence Weinberger was a software developer for Defendant 911

Datamaster, Inc. from January 2012 until he was terminated on June 29, 2017. After

his termination, Weinberger filed an eleven-count complaint against 911 Datamaster,

its President and CEO Scott Krehbiel, and its Executive Vice President Eric Regnier

(collectively "Datamaster"), alleging wrongful discharge, violations of the Americans

with Disabilities Act ("ADA") and Montana Human Rights Act, breach of contract,

fraud, and various causes of action related to Datamaster's alleged theft of his

intellectual property. (Doc. 5.) Datamaster seeks summary judgment on all eleven

claims. (Doc. 23.) For the following reasons, the motion is granted.

1

## BACKGROUND[1]

Lawrence Weinberger is a software developer in Missoula, Montana. (Doc. 13 at ¶¶ 3d, 3e.) While working for a company called Contact One, he developed software called MapSAG that incorporated geo-spatial mapping into a program used by many 911 dispatchers across the country. (Doc. 33-13 at ¶ 3; Doc. 53 at ¶ 10.)

Datamaster is a Kansas corporation that develops 911 dispatch software. (*See* Doc. 53 at ¶¶ 1, 4.) In 2011, Datamaster decided to expand its offerings to include a program that, like MapSAG, incorporated geographic information. (*Id.* at ¶¶ 4–6.) Datamaster contacted Weinberger after realizing its existing employees did not have the necessary experience to develop the new product. (*Id.* at ¶¶ 5–9.)

In early January 2012, Datamaster hired Weinberger as a consultant. (Doc. 13 at ¶¶ 3f, 3h; Doc. 33-13 at ¶ 17; Doc. 53 at ¶ 15.) On January 3, 2012, Weinberger signed an agreement labeled "Nondisclosure/Noncompetition/Ownership of Code," which provided "911 Datamaster or its successors retain exclusive and sole ownership of any and all source and object code created by Larry Weinberger for 911 Datamaster." (Doc. 53 at ¶ 15; Doc 26-7.) He also signed a "Contract Programmer

---

[1] The facts are those stipulated to by the parties, (Sched. Or., Doc. 13 at ¶ 3), and those submitted with the summary judgment briefs, (Docs. 25, 33-13, 53). They are undisputed unless otherwise indicated. Disputed facts are construed in favor of Weinberger. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam).

Agreement" which similarly provided Datamaster owned or had unconditional rights to his work. (Doc. 53 at ¶ 18; Doc. 26-8.)

On January 21, 2012, Datamaster hired Weinberger as a full-time employee. (Doc. 13 at ¶ 3f; Doc. 33-13 at ¶ 25; Doc. 53 at ¶¶ 19–20.) Weinberger signed the employment offer, which provided, among other things, that his base salary would be $9,583.34 per month, or $115,000 annually, and that Datamaster would provide health, dental, and life insurance. (Doc. 53 at ¶ 20; Doc. 26-9.) The offer instructed Weinberger to sign and complete a Nondisclosure/Noncompetition Agreement, also called a Confidentiality Agreement, by his first day of work. (*Id.*) That Agreement provided, in part, that Datamaster would own any "inventions processes, improvements, ideas, copyrightable works of art, trademarks, copyrights, formulas, manufacturing, technology, developments, writings, discoveries, and trade secrets" that Weinberger developed within the scope of his employment. (Doc. 26-10 at 3.)

Weinberger never signed the Confidentiality Agreement. (*See* Doc. 53 at ¶¶ 21–26.) According to Weinberger, Datamaster CEO Scott Krehbiel promised he would retain ownership of his intellectual property and knew he had not signed the Agreement. (*Id.* at ¶¶ 21–27.) Datamaster denies that promise was made and claims it was unaware Weinberger had not signed the Agreement until this litigation. (*Id.* at ¶ 25.) Weinberger also asserts Krehbiel promised him annual bonuses of $10,000,

3

annual 3% cost of living raises, and long-term disability insurance. (*Id.* at ¶ 27.)
Datamaster denies this. (*Id.*)

As an employee at Datamaster, Weinberger participated in the development of
a program called SpatialStation. (Doc. 33-13 at ¶ 33.) Weinberger estimates he
performed at least 95% of the programming for SpatialStation. (*Id.* at ¶ 34.)
Krehbiel is unsure of how work on SpatialStation was divided among Datamaster's
coders but agrees that Weinberger was the primary coder on the project. (Doc. 26-2
at 43–44.)

In December 2016, Weinberger advised Krehbiel that he could no longer work
full time because his health was declining. (*See* Doc. 53 at ¶¶ 50–51.) They agreed
Weinberger would work four days per week and his salary would be reduced by 20%.
(*Id.* at ¶ 55.) In March 2017, Weinberger asked Krehbiel for a three-day work week
with no reduction to his salary or benefits. (*Id.* at ¶ 58.) Krehbiel agreed. (*Id.* at
¶ 60.) However, Datamaster claims the arrangement was temporary until another
developer could take over Weinberger's responsibilities. (*Id.* at ¶ 59.) Weinberger
claims he never agreed to transition his role to another employee. (*Id.*) Rather,
Weinberger claims Krehbiel assured him his job was safe and he could work as little
as one day a week as a "guru" or "wizard." (*Id.* at ¶¶ 52–54, 56–57, 61.) The
meaning of the terms "guru" and "wizard" is disputed. Weinberger uses them as a
job title. (*See id.*) Krehbiel uses the terms generally to describe Datamaster's coders,

4

(Doc. 26-11 at 5–6, 8), but explained in his deposition that Weinberger's "job wasn't changing to a wizard," (*id.* at 10). In any event, on June 29, 2017, Weinberger was terminated from Datamaster. (Doc. 53 at ¶ 63; Doc. 13 at ¶ 3k.)

Weinberger filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on May 11, 2018. (Doc. 53 at ¶ 79.) The EEOC issued a Notice of Right to Sue on June 14, 2018. (*Id.* at ¶ 80.) Weinberger sued in state court on May 24, 2018, alleging wrongful discharge (Count 1), actual fraud (Count 2), actual malice (Count 3), violations of the ADA and Montana Human Rights Act (Count 4), intentional interference with prospective economic advantage (Count 5), unjust enrichment (Count 6), negligent retention and supervision (Count 7), breach of contract (Count 8), breach of the obligation of good faith and fair dealing (Count 9), conversion (Count 10), and misappropriation of trade secrets (Count 11). (Doc. 5.) Datamaster removed to this Court on July 27, 2018, (Doc. 1), and moved for summary judgment on all claims on May 14, 2019, (Doc. 23).

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden to show the absence of any genuine dispute of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). The burden then shifts to

5

the nonmoving party to produce specific facts that show a material issue remains to be tried. *Id.* at 1103. A nonmoving party with the burden at trial must produce enough evidence to establish the essential elements of its claims. *Id.* The court must view all the evidence and draw all justifiable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, only evidence that could be presented in an admissible form at trial can be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). The court must not weigh the evidence or make credibility determinations. *Anderson*, 477 U.S. at 255.

ANALYSIS

## I.     Propriety of Summary Judgment

Weinberger argues summary judgment is premature because discovery has not closed and he cannot present facts to oppose Datamaster's motion. However, Weinberger filed his response on June 26, (Doc. 33-1), five days after the June 21 discovery deadline, (Sched. Or., Doc. 13 at ¶ 1). He contends discovery has not closed because Datamaster agreed to extend the June 21 deadline. Deadlines aside, Weinberger has not established that further discovery is warranted before the Court considers Datamaster's motion. Rule 56 provides, in relevant part,

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or

6

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The nonmovant must show "(1) it has set forth in affidavit form *the specific facts* it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Stevens v. CoreLogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (internal quotation marks omitted). Speculation that additional discovery may uncover material facts is not enough. *See id.*

Weinberger submitted affidavits from his attorneys, Matthew Lowy and Kai Puhrmann, that deposing Datamaster's Human Resources Director Kelly Krehbiel, Datamaster shareholder Babu Cherian, and Datamaster programmer Jay Bohac is necessary to oppose Datamaster's motion for summary judgment. (Docs. 33-9, 33-10.) The depositions were scheduled for May 20 and 21, 2019, but were canceled after the unexpected death of Purhmann's mother earlier that month. (Doc. 33-10 at ¶¶ 12–13.) Lowy and Puhrmann have not met their burden under Rule 56(d) to identify "the specific facts" they hope to learn from the canceled depositions. *See Stevens*, 899 F.3d at 678. Lowy and Puhrmann merely identify the subject matter the proffered deponents would address. (Doc. 33-9 at ¶¶ 24–26; Doc. 33-10 at ¶¶ 15–17.) Beyond that, they offer only that "[t]he depositions of Ms. Krehbiel, Mr. Cherian, and Mr. Bohac are needed to demonstrate material facts at issue in this case and therefore Defendant's motion for summary judgment is premature," (Doc. 33-9 at

7

¶ 27; Doc. 33-10 at ¶ 18), and "[t]he answers from the depositions of Ms. Krehbiel, Mr. Cherian, and Mr. Bohac could not only establish material facts critical for Mr. Weinberger, but could potentially drive resolution of this case," (Doc. 33-9 at ¶ 28; Doc. 33-10 at ¶ 19). Such conclusory assertions do not justify further discovery or delayed disposition of Datamaster's motion for summary judgment.

## II.    Merits

Weinberger's eleven claims against Datamaster fall into five categories: (1) those arising out of Datamaster's alleged appropriation of his intellectual property; (2) those arising out of Datamaster's alleged promises to provide employment benefits; (3) wrongful discharge; (4) violations of the ADA and Montana disability discrimination statutes; and (5) punitive damages.

### A.    Intellectual property claims

Weinberger bases eight claims, in whole or in part, on Datamaster's alleged appropriation of his intellectual property: actual fraud (Count 2), intentional interference with prospective economic advantage (Count 5), unjust enrichment (Count 6), negligent retention and supervision of employees (Count 7), breach of contract (Count 8), breach of the obligation of good faith and fair dealing (Count 9), conversion (Count 10), and misappropriation of trade secrets (Count 11). To prevail on these claims, he must first establish that he has an ownership interest in the intellectual property at issue.

8

However, Weinberger has not described the relevant intellectual property with particularity. His Complaint variously refers to "intellectual property," (Doc. 5 at ¶¶ 31, 32, 51, 59, 61, 62, 65, 71, 72, 99, 100, 106, 112, 118, 119, 132, 140, 141), "algorithm" or "algorithms," (*id.* at ¶¶ 90, 107, 118, 133, 139, 142), "software programs" or just "programs," (*id.* at ¶¶ 90, 118, 133), "software design" or just "design," (*id.* at ¶¶ 71, 117, 120), "SpacialStation [sic] software," (*id.* at ¶ 106), and the "algorithms used to create the SpacialStation [sic] program," (*id.* at ¶ 99). In his deposition, Weinberger only testified about his "design," without elaborating. (Doc. 26-5 at 29–35.) His response brief mentions for the first time a "system that came to be known as the validation engine," which he explains "does not constitute 'software.'" (Doc. 33-1 at 8.) This seems inconsistent with the pleadings. But because the parties have not defined the technical terms, whether Weinberger is asserting an interest in a computer program, a component of a computer program, or something else, and whether he's alleging different interests in his Complaint and brief, is unclear.

Indeed, even Weinberger seems uncertain about the intellectual property at issue in this case. His response brief argues that "what intellectual property Mr. Weinberger created—an algorithm or software" is a disputed material fact. (Doc. 33-1 at 13.) But Weinberger has the burden at a trial to establish his interest in the intellectual property; he cannot defeat summary judgment by refusing to identify the

property that forms the basis of his claims. *Nissan Fire*, 210 F.3d at 1103.

Datamaster assumes Weinberger's claims are based on the software he developed as a Datamaster employee and analyzed them under federal copyright law. *See Johnson Controls, Inc. v. Phx. Control Sys., Inc.*, 886 F.2d 1173, 1175 (9th Cir. 1989) ("Computer software is subject to copyright protection."). It argues that federal copyright law preempts Weinberger's conversion, unjust enrichment, and actual fraud claims. *See Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137–38 (9th Cir. 2006) (describing preemption inquiry). Datamaster also contends that under the federal work-made-for-hire doctrine, Weinberger has no rights to the software he created as an employee, and therefore all his claims based on ownership of the intellectual property fail. *See* 17 U.S.C. § 201(b) (setting forth work-made-for-hire doctrine); *Id.* § 101 (defining "work made for hire").

Weinberger responds that his intellectual property is not subject to copyright protection. Instead, he claims an interest in trade secrets protected by the Montana Uniform Trade Secrets Act, Mont. Code Ann. §§ 30–14–401 to 409.[2] He also

---

[2] Weinberger and Datamaster cite to both the Montana and Kansas versions of the Uniform Trade Secrets Act. A choice of law analysis is only necessary if there is an actual conflict between the states' laws. *In re Guardianship of Mowrer*, 979 P.2d 156, 161 (Mont. 1999). If there is no conflict, Montana law applies. *Id.* Here, Kansas and Montana have both codified the Uniform Trade Secrets Act. Mont. Code Ann. §§ 30–14–401 to 09; Kan. Stat. Ann. §§ 60-3320 to 30. Montana's version explicitly provides that "computer software" may be a trade secret, but Kansas law does not. *Compare* Mont. Code Ann. § 30–14–402(4) *with* Kan. Stat. Ann. § 60-3320(4). However, case law makes clear that software can be a trade secret in

advances a contractual right to the intellectual property at issue, whatever that may

be. His arguments imply that the intellectual property at issue was developed before

he joined Datamaster, which is consistent with his deposition testimony that he

brought a "design" to Datamaster. (Doc. 26-5 at 29–30.) But again, Weinberger has

not fleshed out the nature of the intellectual property or the circumstances under

which it was created. In any event, because of these failures under the trade secret

and contract theories, all of Weinberger's claims based on Datamaster's alleged

misappropriation of his intellectual property fail as a matter of law.

### 1. Tort claims (Counts 2, 5, 6, 7, 10)

Weinberger's reliance on trade secret law renders his tort claims void. The

Uniform Trade Secrets Act "displaces conflicting tort, restitutionary, and other law of

this state providing civil remedies for misappropriation of a trade secret." Mont.

Code Ann. § 30–14–408(1). Though the Montana Supreme Court has not addressed

the question, other courts have interpreted this provision as preempting tort claims

that are based on the same nucleus of facts as a misappropriation of trade secret

claim. *See Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d

943, 946–47 (W.D. Mich. 2003) (collecting cases). In light of the statutory command

Kansas. *See generally LendingTools.com, Inc. v. Bankers' Bank, N.A.*, 426 P.3d 538
(Kans. Ct. App. 2018) (mem. op.) (per curiam). The only other differences between
the Montana and Kansas statutes are stylistic. Accordingly, there is no conflict and
Montana law applies. *In re Guardianship of Mowrer*, 979 P.2d at 161.

11

that the Uniform Trade Secrets Act "shall be applied and construed to effectuate its general purpose to make the law uniform with respect to the subject of this act among states enacting it," that interpretation applies here. § 30–14–409. Accordingly, to the extent they are based on Datamaster's alleged misappropriation of Weinberger's intellectual property, his claims for actual fraud (Count 2), intentional interference with prospective economic advantage (Count 5), unjust enrichment (Count 6), negligent retention and supervision of employees (Count 7), and conversion (Count 10) are preempted by his Uniform Trade Secrets Act claim.

### 2. Misappropriation of trade secrets (Count 11)

Weinberger has not established the existence of a protected trade secret, so his claim for misappropriation of trade secrets (Count 11) fails as a matter of law. Under Montana's codification of the Uniform Trade Secret Act,

> "Trade secret" means information or computer software, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mont. Code Ann. § 30-14-402(4). Weinberger variously describes the following as trade secrets:

- "specialized knowledge to create the validation engine," (Doc. 33-1 at 20);

12

- "significant, unique knowledge and unique solution strategies to resolve complex geospatial problems," (*id.* at 21);
- "unique solution strategies," (*id.* at 22);
- "validation engine," (*id.* at 21–22).

Weinberger does not describe his purported trade secrets in enough detail, if he has described trade secrets at all. To sustain a claim for misappropriation, "the plaintiff must describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018) (interpreting California's codification of the Uniform Trade Secret Act) (internal quotation marks omitted). Montana courts have not delineated which information is and is not eligible for trade secret protection. However, other jurisdictions have held that knowledge, even specialized knowledge, is not a trade secret; ideas and concepts are not trade secrets; and "high level design specifications" of software programs are not trade secrets. *Agency Solutions.Com LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011) (interpreting California's codification of the Uniform Trade Secret Act). Applying those classifications here, Weinberger's knowledge is not a trade secret. Further, though Weinberger does not explain what he means by "solution strategies," the word "strategy" indicates an idea or concept, which is not protected. *See id.* However, whether the validation engine is a trade secret is unclear because neither

13

party has explained the term. Without knowing more, the Court cannot determine whether the validation engine is the type of information, like knowledge or ideas, that can never be considered a trade secret. Once again, there is a failure to meet the requisite burden to defeat summary judgment.

However, even if the validation engine could be a trade secret in the abstract, Weinberger must show he took "efforts that are reasonable under the circumstances to maintain its secrecy" to establish it is a trade secret in this case. *See* § 30–14–402(4). He has not done so. Weinberger claims he formed a company based on his trade secrets but does not explain how that relates to secrecy. (Doc. 33-1 at 23.) He also claims he "refused to enter into any agreement that would require relinquishing ownership of his trade secrets." (*Id.*) But maintaining ownership and maintaining secrecy are not the same thing. Weinberger could own the validation engine, but it does not automatically follow that he protected its secrecy. Indeed, Weinberger acknowledges that he disclosed the validation engine to Datamaster. (*Id.* at 20–21.) That said, disclosing trade secrets is not necessarily inconsistent with maintaining their secrecy. For example, Weinberger could have had Datamaster sign a confidentiality agreement, but he has not presented any evidence that he asked or required Datamaster to keep the validation engine confidential.

Instead, he contends that "Defendant's [sic] induced Mr. Weinberger to share his trade secrets, then fired him, knowingly obtaining Mr. Weinberger's trade secrets

14

without his express or even implied consent."[3] (Doc. 33-1 at 20–21.) But this goes to whether Datamaster misappropriated the validation engine and skips the threshold question of whether the validation engine is a trade secret. Weinberger has failed to show that he took any efforts to maintain the validation engine's secrecy. *See* § 30–14–402(4). Accordingly, he cannot establish the validation engine is a trade secret and his misappropriation of trade secrets claim (Count 11) fails as a matter of law.

That ends the inquiry, but Weinberger's claim that Datamaster "induced" him to share his trade secrets, then fired him, must be addressed because it bears on some of his other claims. Weinberger has consistently claimed that Datamaster hired him with the plan to fire him after stealing his intellectual property. (Doc. 5 at ¶ 31; Doc. 33-1 at 20–21; Doc. 53 at ¶¶ 70–72.) His purported source for this is former Datamaster employee Mohammed Habib. Weinberger explains that Habib told him about a conversation in which a Datamaster executive, either Krehbiel or Regnier, divulged the company's plan to steal Weinberger's intellectual property. (Doc. 5 at ¶¶ 31–32; Doc. 53 at ¶¶ 70–72; Doc. 26-4 at ¶ 50.) This is inadmissible hearsay. Fed. R. Evid. 802. Krehbiel or Regnier's statements to Habib are likely hearsay, though they may be admissible as a statement of a party opponent. Fed. R. Evid. 801(d)(2). Habib's later statements to Weinberger are also hearsay. Fed. R. Evid.

---

[3] Later, he contradictorily asserts that "[i]t is disputed if, when, or how Defendants acquired Mr. Weinberger's trade secrets." (Doc. 33-1 at 23.)

801(c). Further, Habib testified in his deposition that he does not recall such a conversation and was not involved in the decision to hire Weinberger. (Doc. 26-20 at 31–33, 39.) Weinberger has no admissible evidence that Datamaster hired him intending to steal his intellectual property, and that factual allegation is accordingly disregarded at summary judgment. *Fraser*, 342 F.3d at 1036–37.

### 3. Breach of contract and breach of the obligation of good faith and fair dealing (Counts 8 and 9)

Weinberger claims Datamaster breached an oral contract that he would retain his intellectual property. Specifically, Weinberger alleges Datamaster agreed that he "was to retain ownership of his own design." (Doc. 5 at ¶ 117(7).) Because the parol evidence rule bars evidence of such an agreement, Weinberger's claims for breach of contract (Count 8) and breach of the obligation of good faith and fair dealing (Count 9) fail as a matter of law to the extent they are based on his contractual right to intellectual property.

As discussed above, Datamaster initially hired Weinberger as a consultant. (Doc. 13 at ¶ 3f.) On January 3, 2012, he signed a Contract Programmer Agreement, (Doc. 26-8), and a Nondisclosure/Noncompetition/Ownership of Code agreement, which provided generally that Datamaster would own the intellectual property created by Weinberger, (Doc. 26-7). Soon after, Datamaster hired Weinberger as an employee. (Doc. 13 at ¶ 3f.) The employment contract listed Weinberger's position, salary, and benefits. (Doc. 26-9.) It also instructed Weinberger to "complete and

16

sign the other required forms enclosed and have them available for review on your first day of work." (*Id.* at 2.) The contract listed a Nondisclosure/Noncompetition Agreement, also called a Confidentiality Agreement, among the "other required forms." (*Id.*) That Agreement, in turn, provided that Weinberger "agrees to assign, transfer, and convey all of his right, title and interest in and to any and all said 'ideas' that related generally to Datamaster's business." (Doc. 26-10 at 3.) Krehbiel emailed Weinberger the offer letter and other forms on January 21, 2012. (*Id.* at 1.) Weinberger signed the offer letter the same day. (Doc. 26-9 at 2.) He did not sign the Nondisclosure/Noncompetition Agreement. (Doc. 53 at ¶¶ 20–26.)

Weinberger now takes the position that "[a]n additional oral agreement between Mr. Weinberger and Defendant supplemented the written agreement with additional provisions," including that he "retains ownership of his intellectual property." (Doc. 33-1 at 28.) In his deposition, Weinberger testified that before he signed the employment contract, Krehbiel promised that he could keep ownership of a design that he was bringing to Datamaster. (Doc. 26-5 at 29–30.) Weinberger also argues the new employment contract effected a novation of his obligations under the Contract Programmer Agreement and Nondisclosure/Noncompetition/Ownership of Code agreement he had signed as an independent contractor. Whether a novation occurred such that Weinberger's obligations under the original Nondisclosure/ Noncompetition/Ownership of Code agreement were discharged is a more

17

complicated question of contract law than the parties acknowledge. *See Tvedt v. Famers Ins. Grp. of Cos.*, 91 P.3d 1, 10 (Mont. 2004) (explaining novation standard). However, it is unnecessary to address here. Even if the employment offer novated the Nondisclosure/Noncompetition/Ownership of Code agreement, the parol evidence rule bars Weinberger from introducing proof of the alleged oral agreement which forms the basis of his breach of contract claims.

The parol evidence rule generally bars evidence of prior or contemporaneous oral agreements that contradict or vary the terms of a final written contract. *Richards v. JTL Grp., Inc.*, 212 P.3d 264, 270 (Mont. 2009). Montana's parol evidence rule provides that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Mont. Code Ann. § 28–2–904. Further,

> [w]henever the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms. Therefore, there can be between the parties and their representatives or successors in interest no evidence of the terms of the agreement other than the contents of the writing except in the following cases:
>> (a) when a mistake or imperfection of the writing is put in issue by the pleadings;
>> (b) when the validity of the agreement is the fact in dispute.

§ 28–2–905. However, the parol evidence rule only applies when the parties intend for the written contract to embody their complete and final agreement, as evidenced by the contract's terms. *Brimstone Min., Inc. v. Glaus*, 77 P.3d 175, 186 (Mont.

18

2003). Often, the parties include an integration clause to indicate their intent that the writing represents their final and complete agreement, but that is not dispositive. *Richards*, 212 P.3d at 270. For example, "if a particular element of the alleged extrinsic negotiations is mentioned, covered, or dealt with in the writing, then the writing is presumed to represent all the transactions on that element." *Id.*

Here, the employment contract expressly directed Weinberger to sign the attached Nondisclosure/Noncompetition Agreement, which governs intellectual property ownership, and listed it as a "required document." (Doc. 26-9 at 2.) Whether the Nondisclosure/Noncompetition Agreement, which Weinberger did not sign, is operative need not be decided here. The only issue is whether the employment contract's explicit reference to the Nondisclosure/Noncompetition Agreement triggers the presumption that the written contract is final and complete on the issue of intellectual property, such that the parol evidence rule applies. *Richards*, 212 P.3d at 270. It does; Weinberger cannot introduce evidence of an oral agreement that contradicts the employment contract's express statements regarding the Nondisclosure/Noncompetition Agreement.

Weinberger exhorts that the fraud exception to the parol evidence rule applies. "However, that exception only applies when the alleged fraud does not relate directly to the subject of the contract. Where an alleged oral promise directly contradicts the terms of an express written contract, the parol evidence rule applies." *Sherrodd, Inc.*

19

*v. Morrison-Knudsen Co.*, 815 P.2d 1135, 1137 (Mont. 1991). Here, Weinberger's claims that Datamaster promised he could keep ownership of his design directly contradict the written employment contract's explicit reference to the Nondisclosure/Noncompetition Agreement. Accordingly, the parol evidence rule applies and Weinberger's claims that Datamaster breached an oral contract that he would retain ownership of his intellectual property (Count 8) and breached the obligation of good faith and fair dealing (Count 9) fail as a matter of law.

## B.     Employment benefit claims

Weinberger bases three claims, in part, on Datamaster's alleged failure to provide annual cost of living raises of 3%, annual bonuses of $10,000, disability insurance, a secure job devoid of the stress of being fired, and a secure retirement: actual fraud (Count 2), breach of contract (Count 8), and breach of the obligation of good faith and fair dealing (Count 9).

Like with his claim that Datamaster promised he could keep ownership of his intellectual property, Weinberger's breach of contract claims regarding the raises, bonuses, and disability insurance are based on alleged oral promises by Datamaster. The written employment contract explicitly addresses Weinberger's compensation and benefits and provides that it "is not a guarantee of future employment." (Doc. 26-9.) Consequently, the written contract is presumed to be a final and complete embodiment of the parties' agreement on these issues, and the parol evidence rule

bars evidence of the alleged oral agreement. *Richards*, 212 P.3d at 270.

Accordingly, Weinberger's breach of contract claim (Count 8) and the accompanying breach of the obligation of good faith and fair dealing claim (Count 9) fail as a matter of law to the extent they are based on an alleged oral agreement for employment benefits and continued employment.

Weinberger's fraud claim fails as a matter of law because it is inextricably intertwined with, and thus preempted by, his claim under Montana's Wrongful Discharge from Employment Act ("WDEA"). The WDEA "provides the exclusive remedy for a wrongful discharge from employment." Mont. Code Ann. § 39–2–902. It "explicitly preempts all common law remedies, providing that 'no claim for discharge may arise from tort or express or implied contract.'" *Kulm v. Mont. State Univ.-Bozeman*, 948 P.2d 243, 245 (Mont. 1997) (quoting § 39–2–913). However, this provision only applies to claims that are "inextricably intertwined" with the alleged wrongful termination and does not apply to claims that could have been brought if the plaintiff were still employed. *Id.* at 246.

Here, Weinberger charges Datamaster fraudulently represented that it "wanted to hire him long term, and would keep him employed until he retired despite any disabilities." (Doc. 5 at ¶ 59.) He further alleges Datamaster "intended to secure Mr. Weinberger's services as an employee in order to obtain his intellectual property and did not intend to retain Mr. Weinberger as an employee, nor did they intend to

21

accommodate his disability once they gained access to Mr. Weinberger's intellectual property." (*Id.*) Weinberger's allegations "are premised upon his early termination from employment and are thus preempted by the WDEA." *Kulm*, 948 P.2d at 246.

## C.    Wrongful discharge

Weinberger claims his termination from Datamaster violated the WDEA, Mont. Code Ann. §§ 39–2–901 to 915 (Count 1). A discharge is wrongful if, among other things, it "was not for good cause and the employee had completed the employer's probationary period of employment." § 39–2–904(1)(b). "'Good cause' means reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." § 39–2–903(5).

Weinberger suggests he was discharged "under the guise of Defendant wanting to have a full-time coder . . . but the actual reason was so that 911 Datamaster could misappropriate Mr. Weinberger's intellectual property for their own enrichment." (Doc. 5 at ¶ 51.) He contends the "actual reason" for his discharge was not a legitimate business reason. (*Id.*) As set forth above, there is no admissible evidence that Datamaster hired or fired Weinberger intending to steal his intellectual property. Any allegation by Weinberger to that effect is unsupported speculation. Since that is the only basis for Weinberger's wrongful discharge claim, the claim fails as a matter of law.

22

## D. ADA and Montana Human Rights Act

Weinberger claims Datamaster failed to provide him with reasonable accommodations and terminated him because of his disability in violation of the ADA and Montana Human Rights Act (Count 4). However, Weinberger did not comply with the applicable procedural prerequisites for bringing these claims.

"An individual plaintiff must first file a timely EEOC complaint against the allegedly discriminatory party before bringing an ADA suit in federal court." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1061 (9th Cir. 2006). The claim must be filed within 180 days of the allegedly discriminatory event, though the deadline is extended to 300 days if the plaintiff initially files a claim with an appropriate state agency. *Id.*; 42 U.S.C. § 2000e-5(e)(1). Here, the allegedly discriminatory event was Weinberger's termination from Datamaster on June 29, 2017. (Doc. 13 at ¶ 13k.) But Weinberger did not file a complaint with the EEOC until May 11, 2018, 316 days later. (Doc. 53 at ¶ 79; Doc. 26-22.) Weinberger argues that the deadline did not start to run until the Montana Department of Labor and Industry determined he was eligible for unemployment benefits on August 11, 2017. (Doc. 33-1 at 34, 36.) That contention is bristling with legal problems. Regardless of which claims deadline applies, Weinberger missed it. To be sure, "[t]he filing of a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to filing suit, but is a requirement subject to equitable doctrines such as waiver and tolling." *Josephs*, 443

23

F.3d at 1061. Consequently, Datamaster's argument that the Court lacks subject matter jurisdiction over Weinberger's ADA claim is incorrect. However, summary judgment is appropriate for Datamaster because Weinberger waived his ADA claim by failing to file a timely complaint with the EEOC.

To make a claim of unlawful discrimination under the Montana Human Rights Act, an individual must first file a complaint with the Montana Human Rights Bureau within 180 days of the allegedly discriminatory practice. Mont. Code Ann. §§ 49–2–501(1), 49–2–512; *Borges v. Missoula Cty. Sheriff's Office*, 415 P.3d 976, 981 (Mont. 2018). Weinberger did not file a complaint with the Montana Human Rights Bureau. Instead, he argues that his complaint with the EEOC satisfies the state law requirement to file with the Montana Human Rights Bureau because of the agencies' work-sharing agreement. Even so, Weinberger's EEOC complaint was filed well beyond the mandatory 180-day deadline under state law. Accordingly, Weinberger did not administratively exhaust his Montana Human Rights Act claim and the claim fails as a matter of law.

### E.     Punitive damages

Weinberger's claim for punitive damages (Count 3) fizzles for two reasons. First, in the absence of a surviving claim for substantive liability, the claim for punitive damages must be dismissed. Second, Weinberger bases his claim that Datamaster acted with actual malice, and is thus liable for punitive damages, solely

on the allegation that it hired him with the intent to steal his intellectual property. As discussed above, this allegation is not supported by any admissible evidence.

## CONCLUSION

Based on the forgoing, all eleven of Weinberger's claims fail as a matter of law. Accordingly,

IT IS ORDERED that Datamaster's motion for summary judgment (Doc. 23) is GRANTED.

IT IS FURTHER ORDERED that the pending motions in limine (Docs. 35, 38, 46) are DENIED as MOOT.

DATED this _3rd_ day of September, 2019.

4:13 P.M.

Donald W. Molloy, District Judge
United States District Court